******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

## KAYLA SUPRYNOWICZ ET AL. *v.* NARENDRA B. TOHAN
### (SC 20992)

Mullins, C. J., and McDonald, D'Auria,
Ecker, Alexander and Dannehy, Js.

*Syllabus*

The plaintiffs appealed from the judgment of the trial court for the defendant, a reproductive endocrinologist who, in connection with certain in vitro fertilization procedures he performed, allegedly used his own sperm to impregnate the plaintiffs' mothers without consent. The plaintiffs claimed that, in striking their amended complaint, the trial court had incorrectly determined that their negligence claims sounded in wrongful life, which the defendant argued was not a legally cognizable cause of action in Connecticut, rather than ordinary negligence. *Held*:

The trial court incorrectly determined that the plaintiffs' negligence claims sounded in wrongful life rather than ordinary negligence.

The plaintiffs' negligence claims bore none of the hallmarks of wrongful life claims and, instead, could be properly adjudicated as ordinary negligence claims, as the plaintiffs alleged that the defendant, through his deception, was directly responsible for the mental anguish, physical injury and compromised familial relations they have suffered, and they were not seeking to be made whole by being restored to a state of nonbeing but, rather, to be compensated for injuries and losses that they claimed could have been prevented or substantially mitigated if the defendant had acted with due care.

Accordingly, this court reversed the trial court's judgment with respect to the plaintiffs' negligence claims and remanded the case with direction to deny the defendant's motion to strike as to those claims and for further proceedings.

Argued October 30, 2024—officially released January 14, 2025

*Procedural History*

Action to recover damages for, inter alia, the defendant's alleged negligence, and for other relief, brought to the Superior Court in the judicial district of Hartford and transferred to the judicial district of Hartford, Complex Litigation Docket, where the court, *Farley, J.*, granted the defendant's motion to strike the plaintiffs' amended complaint; thereafter, the court, *Farley, J.*, granted the plaintiffs' motion for judgment and ren-

dered judgment for the defendant, from which the plaintiffs appealed. *Reversed in part*; *judgment directed*; *further proceedings*.

*David B. Newdorf*, pro hac vice, with whom were *Leslie Gold McPadden* and, on the brief, *James R. Brakebill*, for the appellants (plaintiffs).

*Thomas J. Plumridge*, with whom were *Joseph M. Walsh* and, on the brief, *Sally O. Hagerty* and *Stuart C. Johnson*, for the appellee (defendant).

*Opinion*

MULLINS, C. J. The plaintiffs, Kayla Suprynowicz and Reilly Flaherty, who were strangers for most of their lives, discovered through the genetic testing company 23andMe that they are half siblings. They allege in this action that their biological father is the defendant, Narendra B. Tohan, the reproductive endocrinologist who assisted the plaintiffs' parents in the parents' efforts to conceive children. The plaintiffs claim that, in treating their parents' infertility, the defendant utilized his own sperm rather than the sperm of the men they believed to be their fathers to impregnate their mothers, causing the plaintiffs physical and emotional harm. Although the plaintiffs' causes of action were labeled in the complaint as ordinary negligence claims, the defendant moved to strike them on the ground that they were noncognizable wrongful life claims.[1] The trial court agreed and granted the motion to strike the plaintiffs' complaint.

---

[1] Courts have defined a wrongful life claim as one that is brought by or on behalf of an individual born with a congenital abnormality who asserts that, but for a physician's failure to detect and educate the parents regarding the abnormality, the child's mother would have terminated the pregnancy, and the child never would have been born or had to suffer the pain of his or her existence. See *Lynch* v. *State*, 348 Conn. 478, 507, 509, 308 A.3d 1 (2024). This court has not yet determined whether claims for wrongful life are cognizable in this state. Id., 506.

The dispositive issue in this appeal is whether the trial court correctly determined that the plaintiffs' negligence claims sounded in wrongful life rather than ordinary negligence. We conclude that the answer to that question is no and that our recent decision in *Lynch* v. *State*, 348 Conn. 478, 308 A.3d 1 (2024), controls the outcome. In *Lynch*, this court clarified that a claim arising from hospital staff's alleged negligence in using sperm infected with a virus in the course of a therapeutic donor insemination (TDI) procedure sounded in medical negligence, not wrongful life. See id., 484–87, 489–91, 505, 507. Similarly, the plaintiffs' claims in the present case are ordinary negligence claims rather than wrongful life claims because they arise from the defendant doctor's alleged negligence in using his own sperm to impregnate the plaintiffs' mothers during in vitro fertilization (IVF) procedures. Accordingly, we reverse in part the judgment of the trial court.[2]

The following facts, as alleged in the plaintiffs' amended complaint,[3] and procedural history are relevant to our resolution of this appeal. The plaintiffs, who are both in their thirties, were conceived through IVF. The defendant is the reproductive endocrinologist who performed the IVF procedures for the plaintiffs' respective parents.[4] Unbeknownst to the plaintiffs' parents,

---

[2] The plaintiffs argue in the alternative that, if we conclude that their allegations do not sound in ordinary negligence, then we should recognize a cause of action for wrongful life and allow their claims to proceed under that theory. Because we conclude that the plaintiffs' claims sound in ordinary negligence, we do not reach this issue.

[3] It is axiomatic that, in reviewing a trial court's granting of a motion to strike, we take the facts to be those alleged in the complaint and construe them in the manner most favorable to sustaining the complaint's legal sufficiency. See, e.g., *Lestorti* v. *DeLeo*, 298 Conn. 466, 472, 4 A.3d 269 (2010). "[I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied." (Internal quotation marks omitted.) *Geysen* v. *Securitas Security Services USA, Inc.*, 322 Conn. 385, 398, 142 A.3d 227 (2016).

[4] The plaintiffs' parents are not parties to this action.

the defendant used his own sperm in the IVF procedures. The plaintiffs' parents never agreed to the use of donor sperm, and no genetic testing was performed to ensure that the defendant was a suitable donor. Kayla Suprynowicz' mother acknowledged that, after she became pregnant, she was informed that her pregnancy was the result of " 'mixed sperm.' "

In 2019, the plaintiffs learned of the defendant's deception through genetic testing. As a result, they learned that the men they believed to be their fathers were in fact not their biological fathers. In 2021, the plaintiffs brought this action. In their eight count, amended complaint, the plaintiffs alleged negligence, fraudulent concealment, lack of informed consent and violations of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. With respect to their negligence claims, the plaintiffs alleged that the defendant's unauthorized use of his own sperm has negatively impacted their familial relations and caused them mental anguish and physical injury.[5] In her claim of negligence against the defendant, Kayla Suprynowicz further alleged that the defendant's sperm carried a genetic trait that caused her to contract "a cerebral condition and mast cell activation disorder," which has resulted in her having a reduced earning capacity.

Before the plaintiffs filed their amended complaint, the defendant filed a motion to dismiss the original complaint on the ground that, notwithstanding the labels

[5] Specifically, in count one of the amended complaint, Kayla Suprynowicz alleged that the defendant "negligently [1] mixed his sperm with [Gary] Suprynowicz' sperm to impregnate [her mother]; [2] replaced the sperm of Gary Suprynowicz with his own; [3] failed to offer the Suprynowiczes the choice of sperm donor; [4] utilized sperm that contained a genetic trait, including a genetic disease . . . ."

In count four of the amended complaint, Flaherty alleged that, "[a]s a result of [the defendant's] carelessness and negligence, [the defendant] . . . [i]mproperly used his sperm to conceive and impregnate [Flaherty's mother]."

applied to the individual counts, the entire complaint sounded in medical malpractice. Consequently, he argued that, because the plaintiffs had failed to comply with the requirements of General Statutes § 52-190a, the trial court had no personal jurisdiction over him. The defendant further argued that the plaintiffs lacked standing to assert their medical malpractice claims because he and the plaintiffs never had a doctor-patient relationship.

The trial court disagreed with both contentions, concluding that, except for Kayla Suprynowicz' claim that "the defendant used sperm containing a disease causing genetic trait," the plaintiffs' claims were ordinary negligence claims, not medical malpractice claims, such that compliance with § 52-190a was not required.[6] The court further concluded that there was "a sufficient nexus between [the plaintiffs'] injuries and the defendant's alleged misconduct to give [the plaintiffs] standing to prosecute their claims."

The defendant thereafter filed a motion to strike the operative amended complaint in its entirety. With respect to the negligence counts, the defendant argued that they should be stricken because (1) the defendant owed no duty of care to the plaintiffs, and (2) the plaintiffs' claims sounded in wrongful life, which is not a cognizable claim in Connecticut. In response, the plaintiffs argued that the defendant owed them each a duty of care because they were readily identifiable victims of his alleged misconduct, and the harm that they suffered was entirely foreseeable. The plaintiffs also argued that, contrary to the

---

[6] In denying the defendant's motion to dismiss, the trial court noted a disagreement among our trial courts as to whether § 52-190a allows for the dismissal of only a portion of a claim. Because the defendant did not move to dismiss only the portion of Kayla Suprynowicz' negligence claim sounding in medical malpractice, the trial court concluded that it need not determine whether it would have authority to do so. The defendant does not challenge the trial court's decision on the applicability of § 52-190a in this appeal.

defendant's assertions, their claims sounded in ordinary negligence, not wrongful life.

The trial court agreed with the plaintiffs that they "were sufficiently identifiable [persons] to warrant the imposition of a duty of care upon the defendant . . . ." The court reasoned that "the relationship between the defendant and the plaintiffs' mothers was aimed specifically at the objective of producing offspring, an exceptionally narrow class of identifiable persons to which the plaintiffs obviously belong." The court agreed with the defendant, however, that the plaintiffs' negligence claims sounded in wrongful life.

Specifically, the trial court reasoned: "The plaintiffs argue that their claims do not constitute claims for wrongful life because they are 'styled as [negligence] counts.' That distinction is lost on the court. In a wrongful life claim, a child alleges that, but for the negligence of a medical professional, the child would not have been conceived or born, and the child has suffered harm as a result of [his or her] birth. . . . This is precisely what the plaintiffs allege. Had the defendant not used his own sperm to inseminate the plaintiffs' mothers, the plaintiffs would not have been born. . . . The plaintiffs' claims, like other 'wrongful life' claims, present the paradox of [plaintiffs] alleging harm that could only have been avoided if they had never been born at all." (Citations omitted; footnote omitted.) The court further observed that, of the states that recognize wrongful life, all of them limit recovery to extraordinary medical expenses, which the plaintiffs have not alleged. In light of the foregoing, the court granted the defendant's motion to strike the amended complaint in its entirety. The plaintiffs opted not to replead, and the trial court rendered judgment for the defendant.

The plaintiffs appealed to the Appellate Court, claiming that the trial court incorrectly determined that their

negligence claims sounded in wrongful life rather than ordinary negligence. We transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

After the parties filed their briefs, this court issued its decision in *Lynch* v. *State*, supra, 348 Conn. 478, which required us to decide whether the claims of the plaintiffs in that case sounded in wrongful life or medical malpractice. See id., 504–505, 507. In *Lynch*, the plaintiffs brought an action on behalf of their infant son, Joshua Isaac Monroe-Lynch (Joshua), who was conceived through a TDI procedure. See id., 484, 489. In their complaint, the plaintiffs alleged that the hospital staff who performed the TDI procedure negligently impregnated Joshua's mother with sperm from a cytomegalovirus (CMV)[7] positive donor, causing Joshua serious physical and catastrophic neurological injuries. See id., 489–90, 514. On appeal, the named defendant, the state of Connecticut, argued that Joshua's claims "must be understood as 'wrongful life' claims and that this court should follow the majority of states and decline to recognize such claims." Id., 505. We concluded that those claims were not wrongful life claims but, rather, conventional medical malpractice claims. Id., 505, 507. Our reasons for doing so are dispositive of this appeal.[8]

We explained in *Lynch* that, "[a]t the most basic level, courts use the terms 'wrongful birth' and 'wrongful life' to refer to claims that are based on the theory that a

---

[7] CMV is "a type of herpes virus  .  .  .  ." *Lynch* v. *State*, supra, 348 Conn. 485.

[8] As we previously indicated, the defendant moved to strike the plaintiffs' negligence claims on the additional ground that he owed them no duty of care. The trial court rejected that contention, and the defendant has not challenged that determination on appeal. Thus, the defendant's sole contention on appeal is that the plaintiffs' negligence claims sound in wrongful life and that this court should follow the vast majority of courts in other jurisdictions and decline to recognize such claims.

child would not have been born but for the defendant's negligence. . . . 'Wrongful birth' generally refers to claims of this sort brought by the parent or parents whereas 'wrongful life' refers to claims brought by the child. . . . This court has recognized claims for wrongful birth; see *Ochs* v. *Borrelli*, 187 Conn. 253, 256–60, 445 A.2d 883 (1982); but has not yet had occasion to [decide] the wrongful life issue." (Citations omitted.) *Lynch* v. *State*, supra, 348 Conn. 506. "Although courts and commentators often speak of wrongful life and wrongful birth as torts in themselves, it is more accurate to view these terms as describing the result of a physician's negligence. The asserted negligence may involve any number of distinguishable negligent acts including, but not limited to, the misdiagnosis of [a] hereditary condition, the misrepresentation of the risks associated with conception and delivery of a child, the negligent interpretation of diagnostic tests, or the negligent performance of a sterilization procedure." *Lininger ex rel. Lininger* v. *Eisenbaum*, 764 P.2d 1202, 1205 (Colo. 1988).

As we noted in *Lynch*, there are two distinct characteristics of a wrongful life claim. See *Lynch* v. *State*, supra, 348 Conn. 490, 507, 511–12. First, the defendant is not directly responsible for the injury to the child. See id., 507. "[C]ases that bear the 'wrongful life' label [typically] involve a child who has a congenital abnormality born to a mother who would not have proceeded with the pregnancy had she received timely notice of that condition. . . . The alleged negligence is the failure to detect and educate the parents regarding the congenital abnormality [in time for an abortion to be performed]. Indeed, it has been said that the hallmark of a wrongful life case is that the defendant bears no direct responsibility for the child's condition, and courts have relied in part on that fact in declining to recognize such claims." (Citation omitted; emphasis omitted.) Id.;

see, e.g., *Wilson* v. *Kuenzi*, 751 S.W.2d 741, 744–45 (Mo.) ("The heart of the problem in [wrongful life] cases is that the physician cannot be said to have caused the [abnormality]. The disorder is genetic and not the result of any injury negligently inflicted by the doctor. In addition it is incurable and was incurable from the moment of conception. . . . The child's [disability] is an inexorable result of conception and birth." (Internal quotation marks omitted.)), cert. denied, 488 U.S. 893, 109 S. Ct. 229, 102 L. Ed. 2d 219 (1988).

A second characteristic of a wrongful life claim is the inherent difficulty of measuring damages. See *Lynch* v. *State*, supra, 348 Conn. 511–12. "The basic rule of tort compensation is that the plaintiff be put in the position that he would have been in [without] the defendant's negligence." *Siemieniec* v. *Lutheran General Hospital*, 117 Ill. 2d 230, 240, 512 N.E.2d 691 (1987), overruled on other grounds by *Clark* v. *Children's Memorial Hospital*, 955 N.E.2d 1065 (Ill. 2011). In the wrongful life context, that position is nonexistence. Thus, "the cause of action involves a calculation of damages dependent upon the relative benefits of an impaired life as opposed to no life at all, [a] comparison [many courts have concluded] the law is not equipped to make." (Internal quotation marks omitted.) *Siemieniec* v. *Lutheran General Hospital*, supra, 240; see also, e.g., *Lininger ex rel. Lininger* v. *Eisenbaum*, supra, 764 P.2d 1210 ("a person's existence, however handicapped it may be, does not constitute a legally cognizable injury relative to [nonexistence]").

In *Lynch*, the trial court denied the named defendant's motion to strike the plaintiffs' medical malpractice claims on the ground that they were noncognizable wrongful life claims. *Lynch* v. *State*, supra, 348 Conn. 490. In so doing, the trial court reasoned that the claims the plaintiffs brought on behalf of Joshua "were ordinary medical malpractice claims in that they alleged

that the negligence of [the hospital] staff, in using sperm from a CMV positive donor to inseminate [Joshua's mother], caused . . . Joshua [to sustain] severe life-lasting injuries . . . . [T]he court [further] observed that [n]owhere in [the medical malpractice] counts [did] the plaintiffs assert that the [named defendant] negligently failed to diagnose the CMV infections in sufficient time to allow the [plaintiffs] the ability to terminate the pregnancy, the touchstone of a wrongful life claim." (Internal quotation marks omitted.) Id., 490–91.

This court agreed with the trial court that a wrongful life claim does not allege that the defendant caused the mother's pregnancy or the fetus' congenital abnormality. See id., 507–508. We concluded that *Lynch* did not involve a claim for wrongful life because the plaintiffs had alleged and established that the named defendant was "directly responsible both for Joshua's birth and for his condition; [the hospital] staff created the pregnancy, and it was precisely their negligence in doing so that was the proximate cause of Joshua's injuries." (Emphasis omitted.) Id., 508. The named defendant's direct responsibility for the injury to Joshua led this court to conclude that the claims brought by the plaintiffs on behalf of Joshua were not wrongful life claims but were, instead, medical malpractice claims. See id., 507–11.

Likewise, in the present case, the plaintiffs' claims differ fundamentally from wrongful life claims. Unlike wrongful life claims, in which "the defendant bears no direct responsibility for the child's condition"; id., 507; in this case, the defendant is alleged to be responsible both for the pregnancies and the alleged harm. The plaintiffs alleged that the defendant's unauthorized use of his own sperm to impregnate their mothers directly caused the harm of which they complain. As in *Lynch*, this is not a case in which the alleged injury is a condition for which the defendant bears no direct responsibility. See id., 508. To the contrary, it is the plaintiffs'

contention that the defendant's deception is directly responsible for the mental anguish, physical injury and compromised familial relations they have suffered.

Moreover, as in *Lynch*, a calculation of damages does not require a comparison between life in an impaired state and no life at all. See id., 509–12. The plaintiffs do not claim that the defendant's alleged negligence prevented their mothers from terminating their pregnancies, or that the plaintiffs would have been better off had they never been born. That is, the plaintiffs are not asking to be "made whole" by being restored to a state of nonbeing; rather, they are seeking compensation for injuries and losses that they claim could have been prevented or substantially mitigated if the defendant had acted with due care. The plaintiffs' injuries, in other words, were directly and proximately caused by the defendant's misconduct.[9] See, e.g., *Maldonado* v. *Flannery*, 343 Conn. 150, 189, 272 A.3d 1089 (2022) ("[the law allows] a plaintiff [to] recover all of the damages suffered as a result of a tortfeasor's negligence" (emphasis omitted)). In short, the present case bears none of the hallmarks of a wrongful life claim and is properly understood and can be properly adjudicated within the context of ordinary negligence claims.

The judgment is reversed with respect to the plaintiffs' negligence claims and the case is remanded with

---

[9] In reaching a contrary conclusion, the trial court reasoned that the plaintiffs' claims, "like other 'wrongful life' claims, present the paradox of [plaintiffs] alleging harm that could only have been avoided if they had never been born at all." We disagree. In fact, one can easily imagine a scenario in which the plaintiffs were born and avoided the emotional harm of which they complain. For example, the alleged mental anguish could have been avoided completely if the defendant had simply advised the plaintiffs' parents of his intention to use his own sperm in the IVF procedures. If the plaintiffs' parents had agreed to proceed with the IVF procedures, the plaintiffs could have been born without being subjected to the emotional anguish of learning as adults, through an ancestry testing service, that the men who raised them are not their biological fathers.

direction to deny the defendant's motion to strike as to those claims and for further proceedings according to law; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.